In re TDL, TLC, and ZDL, Children

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-05-250-CV

IN THE INTEREST OF T.D.L., T.L.C., T.D.L., AND Z.D.L., CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1) 

------------

I. Introduction

Appellant Wytasha appeals the trial court’s order terminating her parental rights to four of her children.
(footnote: 2)  In six points, Wytasha complains that the evidence is legally and factually insufficient to support the trial court’s finding that termination was in the children’s best interest or either statutory ground for termination found by the trial court.  We will affirm.  

II.  Factual and Procedural Background

Wytasha is the mother of five children:  T.D.L., born May 17, 1996; T.L.C., born May 2, 1997; T.D.L. (hereinafter referred to as T.L. for clarity), born January 3, 1999; Z.D.L., born November 22, 2002; and S.E.H., born January 25, 2004.
(footnote: 3)  

In September 2001, after Wytasha’s first three children were born, Child Protective Services (CPS) received its first referral concerning Wytasha.  The referral alleged neglectful supervision of the three children because Wytasha was taking prescriptions drugs, making her unable to parent her children.  After an investigation, CPS “ruled out abuse at that time.”   

In November 2002, while Wytasha was pregnant with her fourth child, Z.D.L., CPS received its second referral, alleging that Wytasha used the prescription drug Xanax while pregnant with Z.D.L.  On November 22, 2002, Z.D.L. was born and tested positive for Xanax.  During an investigation into this referral, CPS investigator Tracie Harper discovered that Wytasha’s older children were not in school.  Harper called Wytasha on December 9, 2002, informed her of the allegation against her, and scheduled a home visit for the following day.  When Harper went to Wytasha’s home the next day, T.L., who was almost three years old at the time, answered the door.  Wytasha was asleep on the couch, and Z.D.L. was asleep in a baby carrier on the floor.  T.L. unsuccessfully tried to wake his mother.  The phone rang several times, but it did not wake Wytasha.  Harper also tried to wake Wytasha, and after several attempts, she woke up.  Wytasha explained to Harper that a midwife said it was okay to take Xanax while pregnant.
(footnote: 4)  When asked why her older children were not in school, Wytasha explained that she had recently moved to an apartment that was too far from the school, that she did not have transportation to take her children to school, and that the school did not provide transportation.
(footnote: 5)  Wytasha said her mother Brenda planned to move in with her and would provide transportation to take the children to school.  Harper spoke with Brenda, who confirmed the plan.
(footnote: 6)  Harper disposed of the November 2002 referral with “reason to believe” there was physical abuse of Z.D.L. because he tested positive for Xanax but “with factors controlled” because Brenda planned to move in with Wytasha.   

Almost six months later, in May 29, 2003, CPS investigator Courtney Shallenberger received the third referral concerning Wytasha.  A Department of Human Services (DHS) employee made the referral alleging neglectful supervision after seeing Wytasha lying on the DHS lobby floor holding six-month-old Z.D.L. in her arms.  After a DHS employee took Z.D.L. from Wytasha, she could not stand up.  Shallenberger immediately went to the DHS office and talked to Wytasha; Wytasha was slumped over, her eyes kept rolling back, and she was having a hard time communicating.  Some of her responses to Shallenberger’s questions were appropriate, but some were not.  Wytasha explained to Shallenberger that she took her prescription medications—Vicodin, Xanax, Prozac, and “some depression pills”—without eating that day.  Wytasha said Dr. Vasped (phonetic) at the osteopathic hospital prescribed the drugs for her back pain, anxiety, and depression and that she was going to stop taking them because they affected her in a negative way.
(footnote: 7)  While at the DHS office, Wytasha signed a safety plan stating that she would seek adult supervision for her children when she was unable to properly supervise them and would not care for her children when she was under the influence of prescription medications.
(footnote: 8) 

On June 9, 2003, Shallenberger visited Wytasha’s home and informed her of the severity of the allegations against her because it was the third referral concerning Wytasha’s misuse of prescription drugs.  Wytasha said she had stopped taking her medications, and Shallenberger again urged Wytasha to talk to her doctor before taking herself off her medications.  During this visit, Shallenberger had no concerns about the condition of the home or the children’s health, and the children told her they received plenty of food.   

On July 25, 2003, Shallenberger again visited Wytasha at her home. Wytasha told Shallenberger that she had been taking her medications as directed but that she had been out of them for one month.  Wytasha said four of her children had received their shots but that Z.D.L. needed his six-month and seven-month shots.  Three days later, Shallenberger called Wytasha and asked if Wytasha had set up an appointment for Z.D.L.’s shots, but Wytasha had not yet done so.  Wytasha did say that she had an appointment in September with her doctor about her prescription medications.    

On August 6, 2003, Shallenberger again called Wytasha, who said Z.D.L. had received his shots.  The next day, Shallenberger visited Wytasha at her home, and the two discussed Wytasha’s and her children’s health. Shallenberger noticed that Wytasha was coherent and that her speech was not slurred, unlike in previous visits.  After several more visits, Shallenberger closed the case with a finding of “reason to believe for neglectful supervision” because Wytasha failed to take her medications properly, putting her children at risk.
(footnote: 9) Shallenberger decided to leave the children with Wytasha because Wytasha’s mother informed Shallenberger that she kept in daily contact with her daughter and grandchildren and would help Wytasha with babysitting and transportation. On March 30, 2004, two months after S.E.H. was born, CPS received a priority one “neglectful supervision” referral concerning Wytasha.  The referral, made by S.E.H.’s paternal grandmother Barbara, alleged that Wytasha had passed out, thereby leaving the children without adult supervision, that there was no food in the home, that the home and the children were filthy, and that roaches were crawling all over the wall.  CPS investigator Tammy Craddock visited Wytasha’s home the following day.  Wytasha was not at home, but S.E.H.’s father was there with the children.  S.E.H. was dirty, was in a diaper that looked like it had been wet for hours, and had formula caked under his neck.  Craddock washed off the formula, and it left red marks that looked raw and sore.  The home was filthy and roaches were everywhere.  The children slept on mattresses scattered all over the floor without sheets.  The refrigerator contained rotting food, but there was enough food in the freezer and enough dry goods to feed the children for a few days.  Wytasha called home during Craddock’s visit and told Craddock that she was taking Vicodin, Prozac, Xanax, and Soma.  She also explained that she ran out of food stamps in the middle of the month.  Wytasha’s speech was slurred, and she could not understand everything Craddock told her.  Wytasha and Craddock agreed to a safety plan, which included Barbara taking S.E.H. until Wytasha could clean the house and get food in the home and required Wytasha to take a drug test and to refrain from acting as the primary caregiver for the other four children while she was taking medications.  The following day, Wytasha took a drug test and tested positive for marijuana and benzodiazepines.  Wytasha testified at trial that she got her prescription medications from “a friend that knows people.”    

Craddock returned to Wytasha’s home on April 22, 2003, but no one was home.  While Craddock waited outside, Wytasha, the four older children, and two men arrived in a vehicle.  One of the men was drinking a beer, and Craddock observed him get out of the car and urinate on the wheel.  Wytasha appeared drunk; she had difficulty walking, used the wall for stability, and slurred her speech.  Wytasha told Craddock that she was tired but that she had not been drinking.  Wytasha’s home was dirty, there was no food in the home, and the electricity had been shut off.  However, the mattresses were now on frames that Barbara had purchased.  Wytasha explained that she kept food at a friend’s house, where she would prepare it and then bring it back to her house.  Wytasha had not been to a doctor to evaluate her medications. Craddock and her supervisor decided to leave the children with Wytasha for the night,
(footnote: 10) but the next day, Craddock returned to Wytasha’s house and took the children to Barbara’s home.  Craddock explained to Wytasha that the children would remain with Barbara until Wytasha could clean the home and supply it with food and electricity, take another drug test, and set up a doctor’s appointment to get proper medications.  CPS then referred the case to Family-Based Safety Services (FBSS).    

FBSS developed a service plan for Wytasha that included drug treatment. At some point, the children returned to live with Wytasha.  On June 11, 2004, Barbara went to Wytasha’s house to check on the children and found Brenda, who had been babysitting the children that day, passed out on the couch and S.E.H. in a car seat spitting up formula.  An FBSS worker visited Wytasha the next day, and Wytasha agreed to voluntarily place all five children with Barbara. Wytasha and Brenda took drug tests, and both tested positive for prescription medication.  Wytasha also tested positive for cocaine.   

Wytasha agreed to continue the service plan, but she did not set up a drug assessment and only attended a few of the classes FBSS set up for her.
(footnote: 11) Wytasha claimed that she lived too far from the bus line and did not have any other means of transportation to get to the classes.  FBSS offered to arrange transportation for her as long as she called twenty-four hours ahead of time, and Wytasha later used FBSS to get to some ROADS classes.  Wytasha took two more drug tests and tested positive for prescription medications, but she told an FBSS worker that she was not seeing a doctor or on prescription medications at that time.  Wytasha admitted that she got her medications from a friend. 

The children remained with Barbara until August 2004, and at that point, Barbara told FBSS that she could not financially support all of the children.  S.E.H. stayed with Barbara, but FBSS placed the four older children in foster care.  Wytasha had not made any progress on her drug treatment, and FBSS did not believe Brenda could provide a healthy environment based on the recent babysitting incident and her positive drug test.    

CPS caseworker Marwa Tarabishi took over the case when CPS placed the children in foster care.  Tarabishi and Wytasha developed a service plan in which Wytasha would participate in counseling, psychological testing, a drug assessment, and random drug testing.  Tarabishi gave Wytasha the information she needed to set up a drug assessment, but Wytasha never set up an appointment.  Wytasha claimed she did not have transportation to take her to the assessment, but after CPS offered to help with transportation and gave her a bus pass, Wytasha still failed to set up a drug assessment.     

Tarabishi set up a psychological evaluation and provided Wytasha with transportation for the first half of the evaluation, but Wytasha failed to attend the second half, even though she had a bus pass.  Wytasha, who allegedly has sickle cell anemia, claimed the bus stop was too far from her home.
(footnote: 12)  Tarabishi asked Wytasha to provide a doctor’s note stating that she could not walk, but Wytasha failed to do so.  Wytasha never attended any counseling.  Tarabishi asked Wytasha to take a random drug test on three occasions, but Wytasha never took them, again claiming she did not have transportation.  Tarabishi also set up weekly visits between Wytasha and her children, and over the course of nine months, Wytasha attended fifteen of thirty-two offered visits.  On several occasions, the foster parents brought the children to the CPS office for a scheduled visit, but Wytasha did not show up, which greatly disappointed the children.  During the entire time that CPS was involved with Wytasha, she never had a job, although she applied for a few jobs.    

Brenda requested that the children be permitted to live with her, but after conducting a home study on Brenda, CPS determined that she was not a possible placement option.  CPS knew of no other relatives who could serve as a placement option.   

At the time of trial, T.D.L. was doing well in his foster home.  T.L.C., who has had medical and behavioral problems in foster care, was in her third foster home.  T.L., who has had a few behavioral problems since he went to foster care, was doing much better, and Z.D.L. was doing great.  Three months before trial, Wytasha got engaged to Stanley Taylor and is currently living with him and his nine-year-old child in Taylor’s three-bedroom home.  Wytasha testified at trial that she quit taking medications three months before trial but that she has not seen a doctor since she had her last child, S.E.H.  Wytasha testified that she had recently applied for Medicaid.    

On June 23, 2005, after hearing testimony from both sides, the trial court found that Wytasha’s parental rights to T.D.L., T.L.C., T.L., and Z.D.L. should be terminated because she had violated subsections 161.001(1)(D) and (E) of the Texas Family Code and because termination was in the best interest of the four children.  Accordingly, the trial court entered an order terminating Wytasha’s parental rights.  This appeal followed.

III.  Standard of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the State must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Tex. Fam. Code Ann.
 § 161.001 (Vernon Supp. 2005);
 Richardson
 
v. Green
, 677 S.W.2d 497, 499 (Tex. 1984); 
Swate v. Swate
, 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep't of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).  Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence.  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
see also
 
Tex. Fam. Code Ann.
 § 161.001.

The higher burden of proof in termination cases alters the appellate standard for both legal and factual sufficiency reviews.  
In re J.F.C., 
96 S.W.3d 256, 265 (Tex. 2002); 
In re C.H.
, 89 S.W.3d 17, 25 (Tex. 2002); 
In re J.T.G.
, 121 S.W.3d 117, 124 (Tex. App.—Fort Worth 2003, no pet.).  Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof.  
J.F.C.
, 96 S.W.3d at 265-66; 
C.H.
, 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124.  

Accordingly, in reviewing the evidence for legal sufficiency in parental termination cases, w
e “look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.”  
J.F.C.
, 96 S.W.3d at 266.  
In conducting our review, we must disregard all evidence that a reasonable trier of fact could have disbelieved; however,
 we must consider undisputed evidence even if it does not support the finding.  
Id.
  If, after conducting our review, we determine that no reasonable trier of fact could have formed a firm belief or conviction that its finding was true, then we must conclude that the evidence is legally insufficient.  
Id
. 

In determining a factual sufficiency point, we must give due consideration to evidence that the trier of fact could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact finder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001 and that the termination of his or her parental rights would be in the child’s best interest.  
Tex. Fam. Code Ann.
 § 161.001; 
C.H.
, 89 S.W.3d at 25.  In reviewing the factual sufficiency of the evidence, we must consider all the evidence in the record, both that in support of and contrary to the trial court’s findings.  
C.H.
, 89 S.W.3d at 27-29. Additionally, we must consider whether disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in favor of its finding.  
J.F.C.
, 96 S.W.3d at 266.  If the disputed evidence is of such magnitude that a trier of fact could not reasonably have formed a firm belief or conviction that its finding was true, then the evidence is factually insufficient.  
Id
. 

IV.  Endangerment Finding

In her third through sixth points, Wytasha argues that there was insufficient evidence to support the trial court’s finding that she had in any way endangered her four children.  TDFPS argues that there is ample evidence to support the trial court’s findings that Wytasha violated family code subsections 161.001(1)(D) and (E). 

Endangerment means to expose to loss or injury, to jeopardize.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125; 
see also In re M.C.
, 917 S.W.2d 268, 269 (Tex. 1996).  To prove endangerment under subsection (D), TDFPS had to prove that Wytasha (1) knowingly (2) placed or allowed T.D.L., T.L.C., T.L., and Z.D.L. to remain (3) in conditions or surroundings that endangered their physical or emotional well-being.  
See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(D).  Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children’s physical well-being was the direct result of the parent’s conduct, including acts, omissions, or failures to act.  
J.T.G.
, 121 S.W.3d at 125
;
 
see
 Tex. Fam. Code Ann. 
§ 161.001(1)(E).
 Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  
J.T.G.
, 121 S.W.3d at 125
;
 
see
 Tex. Fam. Code Ann. 
§ 161.001(1)(E).  However, it is not necessary that the parent’s conduct be directed at the children or that the children actually suffer injury. 
 Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125.  The specific danger to the children’s well-being may be inferred from parental misconduct standing alone.  
Boyd
, 727 S.W.2d at 533; 
In re R.W.
, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  To determine whether termination is necessary, courts may look to parental conduct both before and after the children’s birth.  
In re D.M.
, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).   

Stability and permanence are paramount in the upbringing of children.
  See In re T.D.C.
, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied).  A fact-finder may infer from past conduct endangering the well-being of the children that similar conduct will recur if the children are returned to the parent.
  See In re D.L.N.
, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), 
disapproved on other grounds by
 
J.F.C.
, 96 S.W.3d at 256, and 
C.H.
, 89 S.W.3d at 17.  Drug use and its effect on a parent’s life and her ability to parent may establish an endangering course of conduct.  
Dupree v. Tex. Dep’t of Protective & Regulatory Servs.
, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).  
Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it.  
J.T.G.
, 121 S.W.3d at 126.  The record contains the following evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment to the physical or emotional well-being of the children.

The record demonstrates that Wytasha continuously abused prescription drugs, even during pregnancy with her youngest child, S.E.H.  The evidence demonstrates that Wytasha also tested positive for marijuana and cocaine on two prior occasions.  CPS and FBSS received a total of four referrals regarding Wytasha—three of which dealt with Wytasha’s prescription drug use.
(footnote: 13)  The CPS investigator urged Wytasha to see a doctor regarding her prescription drug use, but Wytasha continuously failed to do so.  She continued to test positive for drugs although at times she was not seeing a doctor, and she later admitted that she got the drugs from a friend.   

Wytasha contends that the record fails to show any actual injury to the children’s physical or emotional well-being.  Subsections 161.001(1)(D) and (E) only require endangerment to the children’s physical and emotional well-being, which may be inferred from Wytasha’s misconduct standing alone.  
See 
Tex. Fam. Code Ann. 
§ 161.001(1)(D), (E);
 Boyd
, 727 S.W.2d at 533; 
R.W.
, 129 S.W.3d at 738.  Additionally, the record shows CPS and FBSS investigators’ repeated concerns regarding the children’s physical and emotional well-being.  A CPS investigator once found Wytasha passed out on the couch with the children at home, and another time, she was found sprawled on the DHS lobby floor with her six-month-old baby in hand.  CPS investigator Craddock testified that during one visit to Wytasha’s home, there was very little food, the house was filthy, roaches were everywhere, and baby S.E.H. was dirty and had formula caked on his neck.  Craddock testified that she returned the next month and found that the home was still dirty, there was still no food in the home, and the electricity had been shut off.  Wytasha’s prior course of conduct regarding her misuse of prescription drugs demonstrated that she endangered her children’s well-being and that she failed to demonstrate appropriate parenting skills.

Additionally, Wytasha’s course of conduct after CPS informally removed her children from her care shows that she took little or no action to correct these problems.  After FBSS placed the children with Barbara, Wytasha took and failed three drug tests, repeatedly testing positive for prescription medications.  Even though Wytasha said she had no problem with the safety plan set up by FBSS, she failed to set an appointment for a drug assessment, failed to attend any drug treatment classes, and attended only a few ROADS classes.   

After FBSS placed the children in foster care and CPS took over the case, Wytasha failed to participate in the new service plan set up by the CPS investigator.  Wytasha failed to set an appointment for a drug assessment, failed to finish her psychological evaluation, and failed to attend any counseling or take any drug tests set up by CPS.  Wytasha attended less than half of the thirty-two scheduled visits with her children.  Wytasha alleged that she could not carry out the service plan or attend the visits because she lacked transportation.  But both FBSS and CPS offered transportation, and CPS ultimately gave her a bus pass.  

Despite Wytasha’s contention that she stopped using drugs three months prior to trial, the trial court was not required to ignore her history of prescription drug misuse merely because it allegedly abated before trial.  
See R.W., 
129 S.W.3d at 741.  
Moreover, Wytasha’s testimony at trial shows that she failed to realize the severity of the situation and that although she planned to take action, she had not done so.  Wytasha testified that she had not been to a doctor since she had her last child, S.E.H.  She testified, 

And I want to get myself together. . . .  I really want to do right.  I want to start going back to the classes and I want my children back.  And it -- it has been hitting me now.  Because nine months ago when this first happened, I didn’t really think it was going to get like this, and now I see that I’m -- I’m about to lose my children.

Therefore, even if the trial court believed that Wytasha had stopped misusing prescription drugs prior to trial, the court could infer that Wytasha’s prescription drug misuse would likely recur and further jeopardize her children’s well-being.
  
See id.
 

We have carefully reviewed the entire record.  Looking at the evidence in the light most favorable to the trial court’s finding, giving due consideration to evidence that the fact finder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that 
Wytasha knowingly placed T.D.L., T.L.C., T.L., and Z.D.L. in conditions and engaged in conduct that endangered the children’s physical or emotional well-being.  
See 
Tex. Fam. Code Ann.
 § 161.001(1)(D), (E); 
J.F.C.
, 96 S.W.3d at 265-66; 
C.H.
, 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124.  Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court’s finding on endangerment.  We overrule Wytasha’s third through sixth points.

V.  Best Interest Finding

In her first two points, Wytasha argues that there was insufficient evidence to support the trial court’s finding that termination of her parental rights was in her children’s best interest.  TDFPS argues that there is ample evidence to support the trial court’s finding.  

A strong presumption exists that the best interest of a child is served by keeping custody in the natural parent.  
In re W.E.C.
, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.).  The fact finder may consider a number of factors in determining the best interest of the child, including the following:  (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.
  Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H.
, 89 S.W.3d at 27.  

Regarding the first factor, the children did not testify at trial, but the CPS and FBSS investigators and the CPS caseworker testified that all four children are very bonded with their mother and love her very much.  Wytasha testified that T.D.L. expressed a desire to return to her care.   

Regarding the second factor—the children’s present and future physical and emotional needs—CPS caseworker Tarabishi testified that T.D.L., T.L., and Z.D.L. are doing well in foster care.  T.L.C. is the only one of the four children to have problems in foster care, and she is currently in her third foster home. Tarabishi testified that T.L.C. has suffered depression and hallucinations and has been hospitalized twice for behavior and for refusing to take her medications.  She has been physically abusive to other children in the foster home.  Wytasha testified that T.L.C. is used to getting her way but that her behavioral problems have escalated since she was placed in foster care.  Tarabishi testified that she has no concerns about CPS’s ability to find one home to adopt the three boys, but she is unsure if the department will be able to find one home for all four children due to T.D.L.’s special needs.  

Regarding the third factor—the present and future physical and emotional dangers to the children—Tarabishi testified that she is primarily concerned with Wytasha’s drug use; she recommended termination of Wytasha’s parental rights as in the children’s best interest.  Additionally, the record shows that when the children lived with Wytasha, there was little to no food in the home on several occasions, that the electricity had once been shut off, and that the house and children were dirty.  There is evidence that Wytasha had not held a job during her involvement with CPS and FBSS, and she had not yet found a job at the time of trial.  She applied at McDonald’s and a Radisson hotel but did not get a job at either place.  Wytasha was allegedly living with friends and family before she moved in with her new fiancé.  She had not completed her service plan and had not taken the drug tests requested by CPS.  Her fiancé has transportation, and his house is on a bus route, but she does not have transportation of her own.    

Regarding Wytasha’s parenting abilities—the fourth 
Holley
 factor—the record demonstrates that although Wytasha and her children love each other and have a strong bond, Wytasha has failed to demonstrate adequate parental abilities.  She took Xanax while pregnant with her youngest child and continually misused prescription drugs.  CPS investigators found the home filthy, without food, and once without electricity.  A CPS investigator found Wytasha passed out while the children were in the home without adult supervision.  Wytasha left her children in Brenda’s care, and Brenda passed out from prescription drug use while babysitting the children. 

Concerning the fifth factor, although CPS informed Wytasha of various programs that could assist her, including drug treatment and parenting classes, as well as individual and family counseling programs, Wytasha has failed to utilize any of these programs other than attending a few parenting classes. Regarding CPS’s plans for the children—the sixth and seventh factors—the department asked to be named managing conservator of the children and plans to seek a home to adopt all four children.  Currently, T.L. and Z.D.L. are together in one foster home, but the other two children are in two different homes.  None of the current foster homes are willing to adopt the children.  CPS is unaware of any other relatives with whom the children could be placed, but the department plans to seek other relatives interested in adopting the children.   

The record as outlined above provides evidence of numerous acts or omissions of Wytasha—the eighth factor—indicating that the existing parent-child relationship is not in her four children’s best interests.  Wytasha’s continued misuse of prescription drugs and her failure to correct the problem support the trial court’s finding that the best interest of her children is better served by terminating her parental rights.  In her testimony, Wytasha placed great weight on the fact that she is currently engaged and living with her fiancé because he has a three-bedroom home and can provide them with transportation.  But the fact that she is now engaged—a fact that she said nothing of to Tarabishi throughout her involvement with the case—cannot be the sole basis on which the trial court relies in deciding not to terminate Wytasha’s parental rights.

Finally, concerning the ninth factor—any excuse for the parent’s acts or omissions—Wytasha continuously blamed her failure to participate in the service plan or to attend the weekly visits with her children on her lack of transportation, but even after CPS offered to provide her with transportation and gave her a bus pass, Wytasha failed to participate in the service plan.  Wytasha now claims that fiancé can provide transportation, but during the four months that she lived with him, she did not set up or attend any classes or counseling and continued to miss weekly visitations with her children.  The trial court had no obligation to accept this excuse as legitimate.  

Looking at all of the evidence in the light most favorable to the best-interest finding, we hold that a reasonable trier of fact could have formed a firm belief or conviction that its finding was true.
  See J.F.C.
, 96 S.W.3d at 266; 
J.T.G.
, 121 S.W.3d at 124-25.  Additionally, giving due consideration to evidence that the fact finder could have found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Wytasha’s parental rights would be in T.D.L., T.L.C., T.L., and Z.D.L.’s best interest.  
See W.E.C.
, 110 S.W.3d at 247.  Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court’s best-interest finding.  We overrule Wytasha’s first and second points.

V.  Conclusion

Having overruled Wytasha’s six points, we affirm the trial court’s judgment.

SUE WALKER

JUSTICE

PANEL B: DAUPHINOT, WALKER, and MCCOY, JJ.

DELIVERED: February 9, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P. 
47.4.

2:
The trial court also terminated the parental rights of the alleged fathers of the four children, but these four men are not parties to this appeal.  

3:
Before the Texas Department of Family and Protective Services (TDFPS) filed this petition, the trial court entered an order appointing S.E.H.’s paternal grandmother Barbara managing conservator of S.E.H., and thus, S.E.H. was not subject to this suit.  

4:
At trial, however, Wytasha testified that the midwife “didn’t authorize me [to take Xanax, but] . . . she didn’t say I couldn’t take it.”   

5:
Harper later verified that the school, in fact, would not provide transportation.  

6:
Brenda later verified to Harper that she had moved in with Wytasha.

7:
Shallenberger told Wytasha that it was important to follow through on her medications if they were prescribed and that if she wanted to stop taking prescription medications, she should talk to her doctor.    

8:
Wytasha also signed a Release of Information in order for CPS to contact Dr. Vasped, but Shallenberger testified that she never checked into whether he was Wytasha’s doctor or whether he prescribed the drugs.  

9:
Shallenberger testified at trial that she was uncomfortable closing the case due to Wytasha’s history and the fact that Wytasha had not yet gone to her scheduled doctor’s appointment.  CPS referred the case to Family Preservation Services (FPS), but FPS never re-opened the case.  

10:
Craddock and her supervisor made this decision because the weather was cool enough for the electricity to be off and because the children had just eaten fast food.  

11:
FBSS also asked Wytasha to take a psychological evaluation, but FBSS, which normally sets up the evaluation for the parent, failed to schedule one. FBSS enrolled Wytasha in a drug treatment program (CATS) and a parenting program (ROADS).  Wytasha attended some ROADS classes but never completed them, and she set up an appointment for a CATS class but never attended one. 

12:
Wytasha testified at trial that sickle cell anemia makes it difficult for her to walk long distances and that she could pass out if she stayed in the heat for a long period of time.   

13:
The fourth referral dealt with the grandmother’s prescription drug misuse while babysitting the children.